## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

**PEARL YEAST,**

    **Plaintiff,**

v.                                                                                  No.

**AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS, aka Aflac, a foreign corporation,**

    **Defendant.**

**COMPLAINT FOR INSURANCE BAD FAITH, BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING, VIOLATIONS OF THE UNFAIR INSURANCE PRACTICES ACT, VIOLATIONS OF THE UNFAIR TRADE PRACTICES ACT, INJUNCTIVE RELIEF, BREACH OF CONTRACT, AND REQUEST FOR DECLARATORY RELIEF**

Plaintiff Pearl Yeast, through her attorneys, McGinn, Carpenter, Montoya & Love, P.A., states the following as her complaint against Defendant Aflac (American Family Life Assurance Company of Columbus), a foreign corporation.

**JURISDICTION AND VENUE**

1. Plaintiff Pearl Yeast is, and was at all times pertinent hereto, a resident and domiciliary of Albuquerque, Bernalillo County, New Mexico.

2. Upon information and belief, Defendant Aflac is a foreign corporation (domiciled in the State of Nebraska and keeping its principal place of business in the State of Georgia) that does business in New Mexico and is licensed to do so by the New Mexico Department of Insurance.

3. All of the events giving rise to this controversy occurred in Albuquerque, Bernalillo County, New Mexico, or in Santa Fe, Santa Fe County, New Mexico.

4. This Court has personal and subject matter jurisdiction over the named parties.

5.       Venue is proper in this Court under 28 U.S.C. § 1332.

## FACTUAL BASIS

### Insurance Companies Must Act in Good Faith Toward Insureds and the General Public

6.       An insurance company must not misrepresent the nature, quality or speed of payment for the insurance it sells.  The insurance company should not promise the public and prospective insureds one thing, including that it will quickly and fairly handle claims made, when it does not.

7.       An insurance company must not sell policies to individuals that include exclusions or limitations that the companies know unfairly limit the individuals' coverage or make the coverage worthless.

8.       An insurance company must investigate claims made on life insurance policies in a timely manner on its own, rather than requiring grieving family members who have just lost a loved one to conduct the investigation or disprove an exclusion in a policy when the insurance company does not have any belief or evidence that the exclusion applies.

9.       An insurance company must have a system in place for the beneficiaries of a life insurance policy to communicate and receive information on the status of a claim.

10.      An insurance company must timely pay meritorious claims made on a life insurance policy.

11.      An insurance company must pay the full amount promised and due under the terms of its life insurance policy.

12.      An insurance company must reform its policy to meet the reasonable expectations of the insured and provide full coverage when it has misled an insured or the general public about the terms or coverage of a policy.

13. When an insurance company breaks these rules, it harms its insureds, its insureds' beneficiaries, and the general public.

**Aflac Violated the Insurance Rules**

14. Aflac advertises to the general public and its insureds that its accident insurance is affordable, that its coverage is comprehensive, and that "if something happened to you," your love ones would be protected by their products.

15. Aflac advertises to the general public and its insureds that it pays claims quickly—in as little as one day for many types of claims and policies and in as little as four days for all others.

16. On October 12, 2012, Jamie Butler signed up for a guaranteed-renewable accident family insurance plan and named his wife, Plaintiff Pearl Yeast, as his beneficiary under the policy.

17. On July 17, 2014, Jamie Butler died when the CareFlight air-ambulance flight he was riding in crashed in the New Mexico desert.

18. On August 21, 2014, Pearl Yeast submitted to Aflac a signed "Proof of Death-Beneficiary's Statement" and submitted a certificate of death that showed the cause of Jamie Butler's death was multiple injuries from being a passenger in this helicopter crash and that the manner of death was accident.

19. After receiving this claim from Pearl Yeast, Aflac did not investigate Jamie Butler's death or pay Pearl Yeast's claim. Instead, it sent back correspondence on September 2, 2014, asking her to provide "a copy of the police report to include toxicology results" for Jamie Butler's death. Aflac did so despite any evidence or even suspicion that Jamie Butler's death was the result of a law-enforcement action or a crime, that he was under the influence of any intoxicating

substances at the time of his death, or that intoxication by a passenger would have caused the helicopter crash.

20. After speaking to Pearl Yeast, learning that Jamie Butler died in a helicopter crash where he was a passenger, and obtaining signed consent forms that would allow it to obtain documents related to Jamie Butler's death, Aflac still did not investigate Jamie Butler's death, did not obtain any documents with those releases, and did not pay Pearl Yeast's claim. Instead, on November 24, 2014, Aflac once again wrote Pearl Yeast and demanded she provide a "copy of the police report to include the toxicology results" related to his death.

21. In late 2014, Plaintiff asked Plaintiff's attorney to assist her in Aflac's convoluted and unfair claims process.

22. On January 6, 2015, Attorney Kevin Holmes called Aflac on Pearl Yeast's behalf and spoke to a claims representative named "Ginger." Kevin Holmes again told the Aflac representative that Jamie Butler died in a helicopter crash where he was the passenger, that the crash was being investigated by the National Transportation Safety Board, and that a "law enforcement" report for this death would not be available for months or, potentially, years.

23. In that January 6, 2015, phone call, Kevin Holmes asked the Aflac representative why Aflac was demanding the law-enforcement investigation and toxicology report. The representative responded by indicating that they were required under the terms of the policy and that they needed them to ensure that "the deceased was not committing a felony when he died and that the person making the claim was not involved in the death."

24. In response to Aflac's explanation that the law-enforcement investigation and toxicology report were needed to prove that Plaintiff had not murdered her husband as Aflac seemingly alleged, on January 6, 2015, Kevin Holmes faxed Aflac a second certificate of death,

news articles that specifically described the helicopter crash that killed Jamie Butler and included his name and the date and location of the helicopter crash, and a letter confirming the substance of the earlier telephone conversation with "Ginger."

25.     On February 24, 2015, Kevin Holmes called Aflac to inquire about the status of the claim because Aflac had not responded to the January 6, 2015, letter. Kevin Holmes spoke to a claims manager named Susan Skipper. She told Kevin Holmes that she had not received the January 6, 2015, letter, and she asked what it was about. Kevin Holmes explained the letter, explained Aflac's interactions with Plaintiff, and then expressed concerns that Aflac's delay in payment of this claim was in violation of New Mexico insurance law.

26.     In response to Kevin Holmes raising concerns, Susan Skipper simply said that the documents Aflac had requested were explicitly required under the policy and then said that she could not speak to him without a signed authorization from Plaintiff, despite the fact that she and other Aflac representatives already had done so. Kevin Holmes then sent Aflac a letter confirming this conversation and again objecting to Plaintiff's treatment in the course of this claim.

27.     On April 3, 2015, Kevin Holmes sent Aflac a signed authorization from Plaintiff allowing Aflac to communicate with him and allowing Aflac to "discuss, release, or otherwise provide" all insurance policy records, reports, and information with him. Kevin Holmes included with this authorization a letter asking Aflac to produce:

        a.    A complete copy of the Aflac policy in effect at the time of Jamie Butler's death;

        b.    All correspondence, emails or notes of phone calls or other communications with Plaintiff or any member of Jamie Butler's family;

        c.    Copies of all releases Aflac had already received from Plaintiff;

        d.    All documents Aflac had received with the releases Plaintiff had provided;

e. Any statements or reports obtained during the course of Aflac's own investigation into Jamie Butler's death; and

f. A letter setting out the reasons why Aflac had not yet paid Plaintiff the benefits which she was owed.

28. Rather than provide the documents and information Kevin Holmes requested on Plaintiff's behalf, Aflac faxed on April 9, 2015, its own, separate form of release. The form of the release was substantively the same as the one Plaintiff had already submitted to Aflac. But this form of release was not for Plaintiff—it was directed directly to Kevin Holmes. That same day, Kevin Holmes called Aflac and spoke to claims representative Felicia Stinson, who represented to him that Aflac's legal department required him to sign the Aflac release directly in order to authorize Aflac to speak to him.

29. Felicia Stinson then explained that Aflac was now reconsidering its opposition to paying Plaintiff's claim because it had just now become aware of the fact that Jamie Butler had died in a helicopter crash. Felicia Stinson indicated that if Plaintiff would simply re-submit the claims form, Aflac would begin the process of processing her claim.

30. On April 17, 2015, Kevin Holmes submitted the signed attorney-releases Aflac demanded and sent a letter memorializing the April 9, 2015, conversation reminding Felicia Stinson that Aflac had still not complied with the request to submit the documents requested in the April 3, 2015, letter.

31. On June 1, 2015, Felicia Stinson called Kevin Holmes and said that she simply needed Plaintiff to re-submit her claim and Aflac would "pay it." Kevin Holmes told Felicia Stinson that Aflac had still not sent the documentation requested in the April 3, 2015, letter, which were necessary to determine what Plaintiff was owed under the terms of the policy (which neither Plaintiff nor her attorney had even seen at that point, despite multiple requests). Kevin Holmes

asked Felicia Stinson to fax the documents and offered a number to do so, but Felicia Stinson said she could not and would instead submit the documents by mail that day.

   32. On June 2, 2015, Aflac faxed a copy of its "file" for this matter to Kevin Holmes. The documents sent included Jamie Butler's application, some of Plaintiff's initial correspondence for her initial claim with Aflac, some of Kevin Holmes' letters, and an "example" policy. The documents did not include the actual policy, any of the releases obtained by Aflac, any documents demonstrating any kind of investigation, and none of the other documents requested in the April 3, 2015, letter.

   33. On June 26, 2015, Aflac employee Elizabeth Skinner sent Plaintiff a letter claiming that because Plaintiff had not submitted a signed "Proof of Death-Beneficiary's Statement," Aflac was closing the claim and denying payment.

   34. Based upon the June 26, 2015, letter Aflac sent to Plaintiff, Kevin Holmes called Aflac on July 8, 2015, and spoke to "Tim." Kevin Holmes explained to Tim the entire history of this claim and told Tim that despite Felicia Stinson's promise to send a certified copy of the policy (which Plaintiff needed in order to understand her rights and the manner in which this process was supposed to be carried out), Aflac had never sent one. Kevin Holmes also told Tim that Aflac had never sent the remainder of the documents requested in the April 3, 2015, letter. Tim promised to "elevate" the issue to an expedited claims office and promised a certified copy of the policy within five business days.

   35. Also on July 8, 2015, Plaintiff submitted to Aflac another signed "Proof of Death-Beneficiary's Statement," which Tim had represented was the only document necessary to ensure the claim would be paid.

36. Aflac did not pay the claim. Instead, on July 7, 2015, Aflac had sent Plaintiff a letter *cancelling* her policy and a check "refunding" her $316.50 with no explanation whatsoever.

37. On July 27, 2015, Kevin Holmes called Aflac. He spoke to a claims representative named "Shalonda" (employee number 16454). He explained the history of the claim up to this point and asked why no copy of the policy had been mailed. Shalonda initially claimed that the policy *had* been sent out. Kevin Holmes challenged her on this, and Shalonda looked into it. After returning, Shalonda explained that Aflac had intended to send the policy on July 17, 2015, but had instead *cancelled* Plaintiff's policy and cancelled her pending claim without payment. Shalonda promised to fix the issue, claiming it would take approximately ten business days to do so.

38. On August 4, 2015, Aflac mailed to Plaintiff (not her attorneys) a check for $10,000 without any explanation whatsoever as to what provisions of the policy that amount was based upon.

39. On August 12, 2015, Aflac finally sent Kevin Holmes a copy of the at-issue policy.

40. On September 1, 2015, Felicia Stinson called Kevin Holmes and left a message. Plaintiff's attorney immediately returned her call and left a message asking her to call back. Felicia Stinson did not call back until September 10, 2015. In that September 10, 2015, phone call, Felicia Stinson asked whether Kevin Holmes had received all of the documents requested on April 3, 2015. Kevin Holmes discussed the categories of documents requested on April 3, 2015, and the two determined that:

    a. Aflac had sent a copy of the policy on August 12, 2015, more than four months after requested.

    b. Aflac had no notes of correspondence with Plaintiff, other than the beneficiary statement she submitted to begin the claim and Aflac's letter to her rejecting it.

  c. Aflac had no releases on file, even though Felicia Stinson conceded that they had received some from Plaintiff.

  d. Aflac had no documents on file obtained in its investigation of this claim because Aflac *never requested* any documents from any entity or individual.

  e. Aflac had no statements or reports obtained during the course of its own investigation because—as Felicia Stinson conceded—Aflac did not investigate this death. Instead, it simply demanded Plaintiff provide the law-enforcement investigation and toxicology report immediately upon receiving the claim and without reason.

  f. The only correspondence Aflac ever sent explaining its rejection of Pearl Yeast's claim was the first denial letter it sent wherein it asked Plaintiff to provide the law-enforcement investigation and toxicology report.

41. After finally obtaining the policy over a year after Mr. Butler's death, Plaintiff's attorney wrote Aflac a letter on October 30, 2015, requesting the company pay the full $150,000 benefit because air-ambulances fall under the "common carrier" provision of the policy and requesting Aflac's position on whether Ms. Butler could cash the $10,000 check without affecting her claims for the full policy.

42. On February 12, 2016, Kevin Holmes wrote another letter to Aflac because Aflac had never been clear about whether Ms. Butler may cash the $10,000 check without affecting her claims to the full benefits under the policy. On March 1, 2016, Aflac finally wrote back and made clear that cashing the $10,000 check in no way impairs or revokes her rights of appeal or litigation in this matter.

43. The fact that Ms. Yeast, an intelligent, educated woman, and her lawyers have had this much difficulty obtaining the death benefits she is owed, is indicative of a pattern and practice of delay and denial for death claims, which likely results in many claimants, particularly grieving relatives, abandoning their legitimate claims against Aflac.

## COUNT I:  INSURANCE BAD FAITH

All previous paragraphs are incorporated herein by reference.

44. Plaintiff is the named beneficiary under an accidental death and dismemberment policy issued by Aflac to her deceased husband, Jamie Butler.

45. Plaintiff performed in a timely manner all duties and obligations required of her under the terms of the Aflac policy for making a claim.

46. Plaintiff suffered a loss compensable under the accidental death provisions of the Aflac policy as a result of her husband's accidental death in a helicopter crash on July 17, 2014.

47. Aflac had a duty to act honestly and in good faith with Plaintiff in relation to her claim for accidental death benefits a result of Jamie Butler's July 17, 2014, death.

48. The actions of Aflac, as set forth above, constitute a denial and/or unreasonable delay in payment of insurance benefits.

49. Aflac's denial and/or unreasonable delay were undertaken for reasons that were frivolous or unfounded.

50. Aflac willfully, recklessly, and without regard for Plaintiff's rights breached its duty to act honestly and in good faith with Plaintiff by failing to timely evaluate and pay Plaintiff's claim.

51. As a direct and proximate result of the crash causing the death of her husband, Ms. Yeast suffered terribly, which suffering was compounded by Aflac's failure to immediately pay the full limits of the policy – $150,000 – which her husband, Jamie Butler, thought would provide for her if he were ever killed.  Ms. Yeast is entitled to damages for the full value of the policy and the additional suffering caused by Aflac's failures and deliberate actions.

52.     In addition to recovering the damages listed above, Plaintiff is entitled to recover her attorney fees and costs in pursuing this action pursuant to NMSA 1978, § 39-2-1 (1977), as well as punitive damages.

## COUNT II:  BREACH OF THE IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING

All previous paragraphs are incorporated herein by reference.

53.     In issuing insurance policies and adjusting claims, Defendant Aflac had a duty to act in good faith and treat its policyholders in a fair manner, to hold its insureds' interests equal to its own, and to act honestly, both in fact and in law, in these dealings.

54.     In undertaking the wrongful acts described herein, Aflac has breached its duty of good faith and fair dealing, causing damages to Plaintiff to be proven at trial, and its conduct warrants the imposition of punitive damages.

## COUNT III: VIOLATION OF UNFAIR INSURANCE PRACTICES ACT

All previous paragraphs are incorporated herein by reference.

55.     At the time of Jamie Butler's death, the Unfair Insurance Practices Act, NMSA 1978, § 59A-16-20 (1997) was in effect and prohibited unfair insurance claims practices.

56.     In its handling of Plaintiff's claim for coverage benefits, Aflac violated § 59A-16-20, by:

   a. Misrepresenting to Plaintiff pertinent facts or policy provisions relating to the coverage at issue;

   b. Failing to acknowledge and act reasonably promptly upon communications with respect to the claim from Plaintiff arising under the policy;

   c. Failing to adopt and implement reasonable standards for the prompt investigation and processing of Plaintiff's claims arising under the policy;

    d. Failing to affirm or deny coverage of Plaintiff's claim within a reasonable time after proof of loss requirements under the policy had been completed and submitted by Plaintiff;

    e. Not attempting in good faith to effectuate prompt, fair and equitable settlements of Plaintiff's claims in which liability has become reasonably clear;

    f. Failing to settle all catastrophic claims within a ninety-day period after the assignment of a catastrophic claim number when a catastrophic loss has been declared;

    g. Compelling Plaintiff to institute litigation to recover amounts due under the policy by offering substantially less than what will be proven due to her at trial;

    h. Attempting to settle Plaintiff's claim for less than the amount to which a reasonable person would have believed he or she was entitled by reference to written or printed advertising material accompanying or made part of an application;

    i. Failing, after payment of a claim, to inform Plaintiff, upon request, of the coverage under which payment has been made;

    j. Delaying the investigation or payment of claims by requiring Plaintiff to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information; and

    k. Failing to promptly provide an insured a reasonable explanation of the basis relied on in the policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

57. As a direct and proximate result of the crash giving rise to coverage under the contract, Plaintiff experienced the loss of her husband, which should have triggered full payment of his accidental death benefit in the amount of $150,000. Aflac's actions and the willful pattern and practice of dealing with death claims have caused additional suffering to Ms. Yeast and other claimants from the state of New Mexico, some of whose grieving relatives may have abandoned their claims because of the hurdles placed in their way by this company.

58. The conduct of Aflac, as set forth above, knowingly or willingly, or with such frequency as to indicate its general business practice in this State, engaged in unfair insurance claims practices prohibited by NMSA 1978, Section 59A-5-26(C)(2)(a) and (b), where Aflac:

   a. has without just cause failed to pay, or delayed payment of, claims arising under its policies, whether the claim is in favor of an insured or in favor of a third person with respect to the liability of an insured to such a third person; or

   b. without just cause compels insureds or claimants to accept less than the amount due them or to employ attorney or to bring suit against the insurer or such an insured to secure full payment or settlement of a claim.

59. Defendant Aflac's acts, omissions, policies and conduct in violating the New Mexico Trades Practices, Frauds Act, and the New Mexico Insurance Code has damaged Plaintiff.

60. In addition to recovering the damages listed above and to be proven at trial, Plaintiff is entitled to recover her attorney fees and costs in pursuing this action pursuant to NMSA 1978, § 39-2-1 (1977) and NMSA 1978, § 59A-16-30 (1990), as well as punitive damages.

### COUNT IV:  VIOLATION OF UNFAIR TRADE PRACTICES ACT

All previous paragraphs are incorporated herein by reference.

61. At the time when Jamie Butler was convinced to purchase Aflac accidental death and dismemberment insurance—around October 12, 2012, and at all times after—the New Mexico Unfair Practices Act, NMSA 1978, §57-12-1 et. seq., was in effect and prohibited persons selling insurance from engaging in unfair or deceptive trade practices.

62. In the sale and servicing of Jamie Butler's insurance policy and in violation of the Unfair Practices Act, Aflac:

   a. represented to the general public and to Jamie Butler that its goods or services had benefits, qualities, or quantities that they did not have;

   b. represented to Jamie Butler that the insurance coverage they provided to him was adequate for his needs when in fact it was not;

      c.      stated that a transaction involved rights, remedies or obligations that it did not involve;

      d.      failed to deliver the quality or quantity of goods or services contracted for;

      e.      took advantage of Jamie Butler and his widow's lack of knowledge, ability, or experience to a grossly unfair degree;

      f.      misled Jamie Butler and his widow and beneficiary into believing they were receiving goods or services of a certain value when in fact, they were not; and

      g.      created a gross disparity between the value received by Jamie Butler and Plaintiff and the price paid for the services provided.

63. As a direct and proximate consequence of the willful, unfair, deceptive, or unconscionable trade practices of Aflac as described previously in this Complaint and to be further proven at trial, Plaintiff was denied the insurance coverage Jamie Butler was deceived into purchasing, and Plaintiff is entitled to all damages to be proven at trial, costs, attorney's fees, punitive damages and treble damages under NMSA 1978, § 57-12-10(B) and (C).

## COUNT V:  INJUNCTIVE RELIEF

All previous paragraphs are incorporated herein by reference.

64. Plaintiff is entitled to injunctive relief requiring that Aflac be enjoined from continuing practices that violate its duties, as well as the contractual and legal obligations owed to Plaintiff.

65. Aflac must be compelled to stop its practices of failing to make timely and fair offers of settlement, instituting additional burdens and hurdles that prevent timely payment of claims, failure to tender prompt payment of damages insureds are entitled to receive, and failure to hold insureds' interests equal to its own.

66. Aflac must further be compelled to stop its practice of falsely advertising the benefits and services it claims to provide.

## COUNT VI:  BREACH OF CONTRACT
## AND REQUEST FOR DECLARATORY RELIEF

All previous paragraphs are incorporated herein by reference.

67.     On October 12, 2012, based upon Aflac's representations, Jamie Butler signed up for a guaranteed-renewable accident family insurance plan that was paid in full and in effect at the time he died.

68.     Under the terms of Jamie Butler's policy with Aflac, Plaintiff—as Jamie Butler's designated beneficiary—was to receive $150,000 upon his accidental death.

69.     After Jamie Butler's tragic death in a helicopter crash, his widow, Plaintiff Pearl Yeast, submitted a claim to Aflac on the approved claim form and provided a copy of his death certificate.

70.     Aflac initially denied Plaintiff's claim, directing her instead to submit additional, unnecessary paperwork.

71.     After receiving additional information from Plaintiff, Aflac waited until more than a year after Jamie Butler's death to submit any payment to Plaintiff.

72.     When Aflac did submit payment to Plaintiff, it was in the amount of only $10,000.

73.     Aflac initially refused to explain why it was paying only $10,000 under the policy.

74.     Eventually, Aflac indicated that it was paying only $10,000 under the policy based upon its interpretation that Jamie Butler died while participating in a "hazardous activity" which triggered the policy's hazardous activity limitation.

75.     The hazardous activity limitation does not apply to individuals who died on aircraft and who did not have a duty to operate or maintain the aircraft.

76.     At the time of his purchase of the Aflac policy, Jamie Butler had a reasonable expectation that any accidental death he suffered at work would be fully covered under the Aflac policy and the contract of insurance should be conformed to the expectations of the parties.

77.     By denying coverage to Plaintiff and refusing to pay Plaintiff's full claim, Aflac has breached its insurance contract.

78.     Plaintiff is entitled to a declaratory judgment that she is entitled $150,000 under the accidental death benefits provision of the contract.

79.     In addition to recovering the damages listed above, Plaintiff is entitled to recover her attorneys' fees and costs in pursuing this action pursuant to NMSA 1978, § 39-2-1 (1977), as well as punitive damages.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff Pearl Yeast requests that the Court enter judgment in her favor against Aflac for compensatory and punitive damages in an amount to be determined at the time of trial, costs, pre- and post-judgment interest, attorney fees, treble damages, and such other relief as the Court deems just and proper.

Plaintiff also demands a trial by jury under Federal Rule of Civil Procedure 38(a).

Respectfully submitted,



*/s/ Randi McGinn*
Randi McGinn
Katie Curry
201 Broadway SE

Albuquerque, New Mexico 87102
p/ (505) 843-6161
f/ (505) 242-8227

*Attorneys for Plaintiff Pearl Yeast*